CALABRESI, Circuit Judge,
concurring:
As Jesus looked up, he saw the rich putting their gifts into the temple treasury. He also saw a poor widow put in two very small copper coins. “Truly I tell you, ” he said, “this poor widow has put in more than all the others. All these people gave their gifts out of their wealth; but she out of her poverty put in all she had to live on.”
Luke 21:1-4.
I join the majority opinion because it properly describes and follows the current law of campaign finance. But all is not well with this law, and I believe it appropriate to state in a judicial opinion why I think this is so.
Judge Crotty has performed a careful analysis of corruption (actual and its appearance), and only of corruption, as a ground for upholding the regulations at issue in this case.[1] His is the necessary analysis under Supreme Court case law. The High Court has told us that the First Amendment protects the right to speak through the use of money, but that the existence of this right does not prevent governments from enacting campaign finance regulations in furtherance of their interest in limiting actual or apparent corruption. McConnell v. FEC, 540 U.S. 93, 143, 124 S.Ct. 619, 157 L.Ed.2d 491 (2003) (“Our cases have made clear that the prevention of corruption or its appearance constitutes a sufficiently important interest to justify political contribution limits.”). At the same time, the Court has rejected the idea that governments may, by campaign finance regulations, pursue the separate interest in what it has rather derisively called “leveling the playing field.” Arizona Free Enterprise Club’s Freedom Club PAC v. Bennett, — U.S.—, 131 S.Ct. 2806, 2825-26, 180 L.Ed.2d 664 (2011). That is, under current Supreme Court doctrine, governments cannot defend campaign finance regulations on the ground that such regulations take into account and respond to the different capacities of the rich and the poor to speak through money; legislatures—the Court has indicated—have no role to play with respect to that. It is with this position that I wish to take issue here.[2]
I agree completely with the Supreme Court that the First Amendment protects each person’s right to express political beliefs through money. Where I disagree *198 with the Court is in its repeated insistence that any recognition of the “level playing field” interest (elsewhere referred to as the “antidistortion interest,” Citizens United v. FEC, — U.S. —, 130 S.Ct. 876, 903, 175 L.Ed.2d 753 (2010)) is inconsistent with this right. To the contrary, the antidistortion interest promotes this right in two important ways. First, it prevents some speakers from drowning out the speech of others. And second, it safeguards something of fundamental First Amendment importance—the ability to have one’s protected expression indicate the intensity of one’s political beliefs. These values, moreover, have not gone unrecognized in underlying First Amendment jurisprudence.
The first benefit of antidistortion measures is not difficult to see. If an external factor, such as wealth, allows some individuals to communicate their political views too powerfully, then persons who lack wealth may, for all intents and purposes, be excluded from the democratic dialogue. In much the same way that anti-noise ordinances help to prevent megaphone users from drowning out all others in the public square, contribution limits can serve to prevent the wealthiest donors from rendering all other donors irrelevant—from, in effect, silencing them. For an articulation of this concern—ie., that, without regulation, the rich would be able to use their wealth to overwhelm the voices of the poor—one need look no further than the Supreme Court’s decision in Red Lion Broadcasting Co. v. FCC, where, in upholding the FCC’s “fairness doctrine,” the High Court long ago explained that, without the rule in place, “station owners and a few networks would have unfettered power to make time available only to the highest bidders” and thereby broadcast only those bidders’ political views. Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 392, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); see also id. at 387, 89 S.Ct. 1794 (“Just as the Government may limit the use of sound-amplifying equipment potentially so noisy that it drowns out civilized private speech, so may the Government limit the use of broadcast equipment. The right of free speech of a broadcaster, the user of a sound truck, or any other individual does not embrace a right to snuff out the free speech of others.”).[3] The same is true of contribution limits: Without restrictions on the size of campaign contributions, the wealthy could flood the campaign coffers of their preferred political candidates, rendering all other contributions negligible by comparison. Contribution limits, like noise ordinances, still allow those who have the capacity a full opportunity to make their speech widely heard—the wealthy remain able to express their views force *199 fully through money—but such limits make sure that this is done only in ways that leave room for everyone else to do the same.[4]
The second benefit of antidistortion measures is perhaps more subtle, but of no less importance: it relates to the ability of all persons, rich and poor, to express the intensity of their feelings. In many circumstances, the intensity of a speaker’s expression tells us much about the intensity of that speaker’s beliefs. Polite applause conveys less enthusiasm than a shouted “Bravo!” Passing criticisms convey weaker disagreement than passionate harangues. And, of course, the tone of a judicial opinion provides some indication of how bleakly a judge views a certain area of the law. But where speech takes the form of a monetary expenditure, the link between intensity of beliefs and intensity of expression, as measured by the amount contributed, can too easily break down. This is a result of the unequal distribution of wealth, which makes the amount of money an individual spends on behalf of a political cause an unreliable measure of the intensity and depth of that individual’s support for the cause. “In other words, and crucially, a large contribution by a person of great means may influence an election enormously, and yet may represent a far lesser intensity of desire than a pittance given by a poor person.” Landell v. Sorrell, 406 F.3d 159, 161 (2d Cir.2005) (Calabresi, J., concurring in the denial of rehearing en banc), rev’d sub nom. Randall v. Sorrell, 548 U.S. 230, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006).
To return to the example of the megaphone in the public square, the problem with its loudness is not just that it drowns out the voices of others, but also that it misrepresents, to an outside observer, the relative intensity of the speaker’s views. That is, even if the megaphone user cares little about the issue being discussed, his voice gets heard above all others, while the voices (and intensity of feelings) of those who care passionately about the issue (and shout their beliefs at the top of their lungs) seem small in comparison. The one speaker’s relative loudness—along with the other speakers’ relative softness—obscures the depth of each speaker’s views, thereby degrading the communicative value of everyone’s message.
The foregoing example may seem fanciful, but money is not. And there is perhaps no greater a distortive influence on the intensity of expression than wealth differences. The wider the economic disparities in a democratic society, the more difficult it becomes to convey, with financial donations, the intensity of one’s political beliefs. People who care a little will, if they are rich, still give a lot. People who care a lot must, if they are poor, give only a little. Jesus’s comment about the rich donors and the poor widow says it all. Today, the amount of an individual’s campaign contribution reflects the strength of that individual’s preferences far less than it does the size of his wallet. In this sense, all political donations—by rich and poor alike—lose a crucially important aspect of their communicative value when campaign funds are unrestricted. And that is a problem of profound First Amendment significance.
It is no small irony, then, that in refusing to recognize the existence of a state interest in “leveling the playing field”—an interest which prior Supreme Court precedents had suggested was compelling, and certainly is at least legitimate—the Court *200 purports to safeguard “the ‘unfettered interchange of ideas.’ ” Bennett, 131 S.Ct. at 2826 (quoting Buckley v. Valeo, 424 U.S. 1, 14, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam)). Far from standing in the way of this ideal, the antidistortion interest is vital to its fulfillment. Left unregulated, the “distorting effects of immense aggregations of wealth,” Austin v. Michigan Chamber of Commerce, 494 U.S. 652, 110 S.Ct. 1391, 108 L.Ed.2d 652 (1990), overruled by Citizens United, 130 S.Ct. at 913, will garble the political debate, trumpeting voices that would otherwise be muted and muting voices that would otherwise be trumpeted. Profound wealth differences, in short, make it difficult for speakers to express (and listeners to discern) the true depths of their feelings. And because wealth inequalities are inevitable, and indeed, many would say are desirable in their creation of incentives, the only way to ensure a truly “unfettered interchange of ideas”—an interchange, that is, where each voice is heard in reasonable proportion to the intensity of the beliefs it expresses—is to give the government some freedom to mitigate the fettering impact of these inequalities.[5]
Indeed, if the Court were correct that the level playing field interest does not provide an appropriate reason for regulating campaign contributions, then it becomes difficult to see why the First Amendment does not give individuals the right to pay other individuals to vote for candidates in elections. Such a practice need not raise the specter of quid pro quo corruption; one might still buy votes on behalf of one’s preferred candidate even if one could ask nothing from the candidate in return. The critical problem with vote-buying is not corruption; it is rather that allowing the practice would give the wealthiest individuals a huge effect over political elections, making even their relatively minor preferences matter immensely and the possibly intense preferences of the poor matter not much at all. This same concern, of course, explains why a state has a valid interest in leveling the playing field with respect to campaign contributions. Yet, curiously, the Supreme Court seems to accept the validity of vote-buying regulations without hesitation, cf. Broum v. Hartlage, 456 U.S. 45, 54-55, 102 S.Ct. 1523, 71 L.Ed.2d 732 (1982), while it refuses to accept the validity of the antidistortion interest.
I am not suggesting that expressing the intensity of one’s views is the only thing that matters in campaign finance doctrine, or in election law more generally.[6] Nor *201 am I suggesting that the playing field must be fully level. This is an area of law in which many considerations come into play, some of which, such as the dangers of quid pro quo corruption, counsel in favor of state regulation, while others, such as the dangers of incumbent entrenchment, counsel against. What specific limitations are and are not appropriate is not for me to say or even to suggest as a judge.[7] They are not the kinds of things courts are suited to decide but instead constitute matters as to which legislative judgment is crucial. What this in turn means is simply stated: So long as the Supreme Court refuses to recognize the importance of the antidistortion interest, and its connection to the ability to express the intensity of one’s feelings, the Court will be ignoring a variable of critical constitutional importance and excluding the most important players—democratically elected legislatures—from their proper role in regard to that variable.
What is at stake here—what everyone knows is at stake here—is what was recognized and expressed so directly, succinctly, and powerfully in the story of the widow’s mite. The ability to express one’s feelings with all the intensity that one has—and to be heard—is a central element of the right to speak freely. It is, I believe, something that is so fundamental that sooner or later it is going to be recognized. Whether this will happen through a constitutional amendment or through changes in Supreme Court doctrine, I do not know. But it will happen. Rejection of it is as flawed as was the rejection of the concept of one-person-one-vote. And just as constitutional law eventually came to embrace that concept, so too will it come to accept the importance of the antidistortion interest in the law of campaign finance.
It is with that faith in a better future, along with an understanding of the requirements of our flawed present, that I join the majority opinion.

. Of course, the majority opinion also discusses the state’s "anticircumvention” interest in connection with the entity ban, but that interest is largely derivative of the state’s "anticorruption” interest.

. As the case before us involves contribution restrictions, I will speak primarily of such restrictions here. But much of what I say applies with equal force to restrictions on independent expenditures.

. The fact that the FCC no longer enforces the fairness doctrine is not relevant to the Court's constitutional analysis in Red Lion. Indeed, what it shows is that bodies other than courts (administrative and legislative bodies) are perfectly capable of taking into account the facts and circumstances that determine what kinds of speech restrictions are inappropriate, undesirable, or even constitutionally problematic. Cf. Syracuse Peace Council v. FCC, 867 F.2d 654, 661 (D.C.Cir.1989) (upholding the FCC's determination that the fairness doctrine no longer served the public interest, and noting, inter alia, the FCC’s conclusions that the doctrine chilled "the expression of unorthodox or 'fringe' views on controversial issues” and that the doctrine was no longer needed in light of the "dramatic increase in broadcasting outlets since [the year of its implementation]”). In contrast with the nuanced handling of the issues by the FCC as upheld by the D.C. Circuit, courts acting on their own and indulging in undemocratic decisionmaking create the danger not only of wrong solutions to difficult constitutional problems, but also of rigid answers to questions that by their nature demand flexible, adaptive, and democratically informed responses.

. The same would be true of payments by the government that match or otherwise increase the contributions of the poor; that is, rather than putting in noise ordinances, the government might prefer to make megaphones widely available.

. Moreover, to the extent that campaign contributions cannot be regulated so as to leave them free to reflect intensity of feeling, the pressure for greater economic equality will increase, and this may be detrimental to those efficiencies that flow from an unequal distribution of wealth. Put another way, if campaign finance doctrine fails to recognize the value of a level playing field in the political realm, there may arise stronger pressures to create a more level playing field in the economy as a whole. The effect of such pressures on incentives and on overall economic wellbeing I leave to others to evaluate.

. If it were, we might expect the ballot to be structured so as to give maximum effect to preference intensity, through such devices as “cumulative voting” or "single-transferrable voting.” See Samuel Issacharoff, Pamela S. Karlan & Richard H. Pildes, The Law of Democracy: Legal Structure of the Political Process 1137-75 (3d ed. 2007). Although some jurisdictions have experimented with cumulative voting models, see id. at 1163-67, 1172-75, most still adhere to the traditional model, in which each individual—regardless of the strength of her preferences—may cast one (and only one) vote for one (and only one) candidate per electoral contest. The infrequent use of these alternative voting systems does not, of course, demonstrate any lack of importance to the expression of preference intensity. It suggests only that, in the context *201 of elections, the need to recognize this value is balanced against other considerations.

. In my life as a scholar, I have proposed some solutions to this problem. See, e.g., Philip Bobbit & Guido Calabresi, Tragic Choices 98-117 (1978) (discussing wealth-distribution-neutral markets); Guido Calabresi, Inaugural Lecture of the Academic Year of the International University College (IUC) of Torino: Merit Goods, the Commons, and Their Significance for Justice, Efficiency, and Equality (May 19, 2011) (video available at http ://www.youtube. com/watch? v=iQnLak WMycM).