Justice Stevens, with whom Justice Souter, Justice Ginsburg, and Justice Breyer join as to Part II,
concurring in part and dissenting in part.
The “Millionaire’s Amendment” of the Bipartisan Campaign Reform Act of 2002, § 319, 116 Stat. 109, 2 U. S. C. § 441a-1 (2006 ed.), is the product of a congressional judgment that candidates who are willing and able to spend over $350,000 of their own money in seeking election to Congress enjoy an advantage over opponents who must rely on contributions to finance their campaigns. To reduce that advantage, and to combat the perception that congressional seats are for sale to the highest bidder, Congress has relaxed the restrictions that would otherwise limit the amount of contributions that the opponents of self-funding candidates may accept from their supporters. In a thorough and well-reasoned opinion, the District Court held that because the Millionaire’s Amendment does not impose any burden whatsoever on the self-funding candidate’s freedom to speak, it does not violate the First Amendment, and because it does no more than diminish the unequal strength of the self-funding candidate, it does not violate the equal protection component of the Fifth Amendment. I agree completely with the District Court’s opinion, specifically its adherence to our decision in McConnell v. Federal Election Comm’n, 540 U. S. 93 (2003). While I would affirm for the reasons given by the District Court, I believe it appropriate to add these additional comments on the premise that underlies the *750 constitutional prohibition on expenditure limitations, and on my reasons for concluding that the Millionaire’s Amendment represents a modest, sensible, and plainly constitutional attempt by Congress to minimize the advantages enjoyed by wealthy candidates vis-a-vis those who must rely on the support of others to fund their pursuit of public office.
I
According to the Court’s decision in Buckley v. Valeo, 424 U. S. 1, 18 (1976) (per curiam), the vice that condemns expenditure limitations is that they “impose direct quantity restrictions” on political speech.[1] A limitation on the amount of money that a candidate is permitted to spend, the Buckley Court concluded, “reduces the quantity of expression by restricting the number of issues discussed, the depth of their exploration, and the size of the audience reached.” Id., at 19. Accordingly, the Court determined that any regulation of the quantity of money spent on campaigns for office ought to be viewed as a direct regulation of speech itself.
Justice White firmly disagreed with the Buckley Court’s holding on expenditure limitations, explaining that such regulations should be analyzed, not as direct restrictions on speech, but rather as akin to time, place, and manner regulations, which will be upheld “so long as the purposes they serve are legitimate and sufficiently substantial.” Id., at 264 (opinion concurring in part and dissenting in part). Although I did not participate in the Court’s decision in Buckley, I have since been persuaded that Justice White — who maintained his steadfast opposition to Buckley’s view of ex *751 penditure limits, see, e. g., Federal Election Comm’n v. National Conservative Political Action Comm., 470 U. S. 480, 507-512 (1985) (dissenting opinion)—was correct. Indeed, it was Buckley that represented a break from 65 years of established practice, as well as a probable departure from the views of the Framers of the relevant provisions of the Constitution itself. See Randall v. Sorrell, 548 U. S. 230, 274, 280-281 (2006) (Stevens, J., dissenting).
In my view, a number of purposes, both legitimate and substantial, may justify the imposition of reasonable limitations on the expenditures permitted during the course of any single campaign. For one, such limitations would “free candidates and their staffs from the interminable burden of fundraising.” Colorado Republican Federal Campaign Comm. v. Federal Election Comm’n, 518 U. S. 604, 649 (1996) (Stevens, J., dissenting). Moreover, the imposition of reasonable limitations would likely have the salutary effect of improving the quality of the exposition of ideas. After all, orderly debate is always more enlightening than a shouting match that awards points on the basis of decibels rather than reasons. Quantity limitations are commonplace in any number of other contexts in which high-value speech occurs. Litigants in this Court pressing issues of the utmost importance to the Nation are allowed only a fixed time for oral debate and a maximum number of pages for written argument. As listeners and as readers, judges need time to reflect on the merits of an issue; repetitious arguments are disfavored and are usually especially unpersuasive. Indeed, experts in the art of advocacy agree that “lawyers go on for too long, and when they do it doesn’t help their case.”[2] It seems to me that Congress is entitled to make the judgment that voters deserve the same courtesy and the same opportu *752 nity to reflect as judges; flooding the airwaves with slogans and sound bites may well do more to obscure the issues than to enlighten listeners. At least in the context of elections, the notion that rules limiting the quantity of speech are just as offensive to the First Amendment as rules limiting the content of speech is plainly incorrect.[3]
If, as I have come to believe, Congress could attempt to reduce the millionaire candidate’s advantage by imposing reasonable limits on all candidates’ expenditures, it follows a fortiori that the eminently reasonable scheme before us today survives constitutional scrutiny.
II
Even accepting the Buckley Court’s holding that expenditure limits as such are uniquely incompatible with the First Amendment, it remains my firm conviction that the Millionaire’s Amendment represents a good-faith attempt by Congress to regulate, within the bounds of the Constitution, one particularly pernicious feature of many contemporary political campaigns.[4]
It cannot be gainsaid that the twin rationales at the heart of the Millionaire’s Amendment — reducing the importance of wealth as a criterion for public office and countering the per *753 ception that seats in the United States Congress are available for purchase by the wealthiest bidder — are important Government interests. It is also evident that Congress, in enacting the provision, crafted a solution that was carefully tailored to those concerns. Davis insists, however, that the Government’s interests are insufficiently weighty to justify what he believes are intrusions upon his rights under the First Amendment and the equal protection component of the Fifth Amendment, and that, regardless of the strength of the justifications offered, Congress’ solution is not sufficiently tailored to addressing the twin concerns it has identified. His arguments are unpersuasive on all counts.
A
The thrust of Davis’ First Amendment challenge is that by relaxing the contribution limits applicable to the opponent of a self-funding candidate, the Millionaire’s Amendment punishes the candidate who chooses to self-fund. Extrapolating from the zero-sum nature of a political race, Davis insists that any benefit conferred upon a self-funder’s opponent thereby works a detriment to the self-funding candidate. Accordingly, he argues, the scheme burdens the self-funding candidate’s First Amendment right to speak freely and to participate fully in the political process.
But Davis cannot show that the Millionaire’s Amendment causes him — or any other self-funding candidate — any First Amendment injury whatsoever. The Millionaire’s Amendment quiets no speech at all. On the contrary, it does no more than assist the opponent of a self-funding candidate in his attempts to make his voice heard; this amplification in no way mutes the voice of the millionaire, who remains able to speak as loud and as long as he likes in support of his campaign. Enhancing the speech of the millionaire’s opponent, far from contravening the First Amendment, actually advances its core principles. If only one candidate can make *754 himself heard, the voter’s ability to make an informed choice is impaired.[5] And the self-funding candidate’s ability to engage meaningfully in the political process is in no way undermined by this provision.[6]
Even were we to credit Davis’ view that the benefit conferred on the self-funding candidate’s opponent burdens the self-funder’s First Amendment rights, the purposes of the amendment surely justify its effects. The Court is simply wrong when it suggests that the “governmental interest in eliminating corruption or the perception of corruption,” ante, at 740, is the sole governmental interest sufficient to support campaign finance regulations. See ante, at 741-743. It is true, of course, that in upholding the Federal Election Campaign Act of 1971’s (FECA) limits on the size of contributions to political campaigns, the Buckley Court held that preventing both actual corruption and the appearance of corruption were Government interests of sufficient weight that they justified any infringement upon First Amendment freedoms that resulted from FECA’s contribution limits; the Court explained that, “[t]o the extent that large contributions are given to secure a political quid pro quo from current and potential office holders, the integrity of our system of representative democracy is undermined. ... Of almost equal concern ... is the impact of the appearance of corruption stemming from public awareness of the opportunities for *755 abuse inherent in a regime of large individual financial contributions.” 424 U. S., at 26-27. It is also true that the Court found that same interest insufficient to justify FECA’s expenditure limitations. Id., at 45-46, 52-56. But it does not follow that the Buckley Court concluded that only the interest in combating corruption and the appearance of corruption can justify congressional regulation of campaign financing.
Indeed, we have long recognized the strength of an independent governmental interest in reducing both the influence of wealth on the outcomes of elections, and the appearance that wealth alone dictates those results. In case after case, we have held that statutes designed to protect against the undue influence of aggregations of wealth on the political process — where such statutes are responsive to the identified evil — do not contravene the First Amendment. See, e.g., Austin v. Michigan Chamber of Commerce, 494 U. S. 652, 660 (1990) (upholding statute designed to combat “the corrosive and distorting effects of immense aggregations of wealth that are accumulated with the help of the corporate form and that have little or no correlation to the public’s support for the corporation’s political ideas”); Federal Election Comm’n v. Massachusetts Citizens for Life, Inc., 479 U. S. 238, 257 (1986) (“Th[e] concern over the corrosive influence of concentrated corporate wealth reflects the conviction that it is important to protect the integrity of the marketplace of political ideas. . . . Direct corporate spending on political activity raises the prospect that resources amassed in the economic marketplace may be used to provide an unfair advantage in the political marketplace”); cf. Red Lion Broadcasting Co. v. FCC, 395 U. S. 367, 390 (1969) (upholding constitutionality of several components of the Federal Communications Commission’s “fair coverage” requirements, and explaining that “[i]t is the purpose of the First Amendment to preserve an uninhibited marketplace of ideas in which *756 truth will ultimately prevail, rather than to countenance monopolization of that market”).
Although the focus of our cases has been on aggregations of corporate rather than individual wealth, there is no reason that their logic — specifically, their concerns about the corrosive and distorting effects of wealth on our political process — is not equally applicable in the context of individual wealth. For, as we explained in McConnell, “Congress’ historical concern with the ‘political potentialities of wealth’ and their ‘untoward consequences for the democratic process’. .. has long reached beyond corporate money,” 540 U. S., at 116 (quoting United States v. Automobile Workers, 352 U. S. 567, 577-578 (1957)).
Minimizing the effect of concentrated wealth on our political process, and the concomitant interest in addressing the dangers that attend the perception that political power can be purchased, are, therefore, sufficiently weighty objectives to justify significant congressional action. And, not only was Congress motivated by proper and weighty goals in crafting the Millionaire’s Amendment, the details of the scheme it devised are genuinely responsive to the problems it identified. The statute’s “Opposition Personal Funds Amount” formula permits a self-funding candidate to spend as much money as he wishes, while taking into account fund-raising by the relevant campaigns; it thereby ensures that a candidate who happens to enjoy a significant fundraising advantage against a self-funding opponent does not reap a windfall as a result of the enhanced contribution limits. Rather, the self-funder’s opponent may avail himself of the enhanced contribution limits only until parity is achieved, at which point he becomes again ineligible for contributions above the normal maximum. See §§ 441a-1(a)(1)(A)-(C).
It seems uncontroversial that “there is no good reason to allow disparities in wealth to be translated into disparities in political power. A well-functioning democracy distinguishes *757 between market processes of purchase and sale on the one hand and political processes of voting and reason-giving on the other.” Sunstein, Political Equality and Unintended Consequences, 94 Colum. L. Rev. 1390 (1994). In light of that clear truth, Congress’ carefully crafted attempt to reduce the distinct advantages enjoyed by wealthy candidates for congressional office does not offend the First Amendment.
B
Davis’ equal protection argument, which the Court finds unnecessary to address, ante, at 744, n. 9, fares no better. He claims that by permitting only the self-funder’s opponent to avail himself of the increased contribution limits, the statute creates an unwarranted disparity between the self-funder and his opponent. But, as we explained in McConnell, “Congress is fully entitled to consider . . . real-world differences . . . when crafting a system of campaign finance regulation.” 540 U. S., at 188. And Buckley itself acknowledged, in the course of upholding FECA’s public financing scheme, that “the Constitution does not require Congress to treat all declared candidates the same.” 424 U. S., at 97. It blinks reality to contend that the millionaire candidate is situated identically to a nonmillionaire opponent, and Congress was under no obligation to indulge any such fiction. Accordingly, Davis has failed to establish that he was deprived of the equal protection guarantees of the Fifth Amendment.
Ill
In sum, I share Judge Wright’s view that nothing in the Constitution “prevents us, as a political community, from making certain modest but important changes in the kind of process we want for selecting our political leaders,” Wright, Politics and the Constitution: Is Money Speech? 85 Yale L. J. 1001, 1005 (1976). In my judgment, the Millionaire’s Amendment represents just such a change. I therefore respectfully dissent.

 The Buckley Court invalidated two different types of limits on campaign expenditures: limits on the amount of “personal or family resources” a candidate could spend on his own campaign, 424 U. S., at 51-54, and overall limits on campaign expenditures, id,., at 54-60. In my judgment the Court was mistaken in striking down both of those provisions; I treat them together here.

 Brust, A Voice for the Write: Tips on Making Your Case From a Supremely Reliable Source, 94 A. B. A. J. 87 (May 2008) (interview with Justice Scaua and Bryan Garner).

 The Court is of course correct that “it would be dangerous for the Government to regulate core political speech for the asserted purpose of improving that speech.” Ante, at 743, n. 8. But campaign expenditures are not themselves “core political speech”; they merely may enable such speech (as well as its repetition ad nauseam). In my judgment, it is simply not the case that the First Amendment “provides the same measure of protection” to the use of money to enable speech as it does to speech itself. Nixon v. Shrink Missouri Government PAC, 528 U. S. 377, 398 (2000) (Stevens, J., concurring).

 I note at the outset of this discussion, however, that I agree with the Court’s conclusion that Davis has standing to challenge §§ 319(a) and (b), and that the case is not moot; I therefore join Part II of the Court’s opinion.

 “In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow as a nation.” Buckley v. Valeo, 424 U. S. 1, 14-15 (1976) (per curiam).

 The self-funder retains the choice to structure his campaign’s funding as he pleases: He may choose to fund his own campaign subject to no limitations whatsoever and still accept limited donations from supporters; alternatively, he may forgo self-financing and rely on contributions alone, at the same level as his opponent. In neither event is his engagement in the political process in any sense impeded.