52 A.3d 1213

PENNSYLVANIA STATE ASSOCIATION OF COUNTY COMMISSIONERS, County of Allegheny, County of Bucks, County of Cumberland, County of Dauphin, County of Erie, County of Forest, County of Fulton, County of Monroe, County of Snyder, County of Tioga, Petitioners

v.

COMMONWEALTH of Pennsylvania; Commonwealth of Pennsylvania, General Assembly; Joseph Scarnati, III in his Official Capacity as President Pro-Tempore of the Pennsylvania Senate; and Samuel H. Smith in his Official Capacity as Speaker of the Pennsylvania House of Representatives, Respondents.

Supreme Court of Pennsylvania.

Argued Dec. 2, 2009.

Decided Sept. 26, 2012.

232

Robert L. Knupp, Knupp Law Offices, LLC, Harrisburg, for Pennsylvania State Association of County Commissioners.

John E. McKeever, DLA Piper US, LLP, Allentown, for Petitioner Amicus Curiae, Committee of Seventy.

Jonathan F. Bloom, Stradley, Ronon, Stevens & Young, L.L.P., Philadelphia, Christopher B. Craig, Public Consulting Group, Inc., Harrisburg, C. Clark Hodgson, Stradley, Ronon, Stevens & Young, L.L.P., Philadelphia, Ronald N. Jumper, Public Consulting Group, Inc., Harrisburg, for Commonwealth of Pennsylvania.

Calvin Royer Koons, Gregory R. Neuhauser, PA Office of Attorney General, Harrisburg, for Office of Attorney General.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## OPINION

Chief Justice CASTILLE.

On July 26, 1996, this Court filed an opinion granting mandamus relief and ordering the General Assembly of the Commonwealth of Pennsylvania to "enact a funding scheme for the court system on or before January 1, 1998." *Pennsylvania State Ass'n. of County Comm'rs. v. Commonwealth of Pennsylvania*, 545 Pa. 324, 681 A.2d 699, 701 (1996) ("*PSACC*"). That directive was in furtherance of the Court's prior holding "that the statutory scheme for county funding of

the judicial system is in conflict with the intent clearly expressed in the constitution that the judicial system be unified." *County of Allegheny v. Commonwealth of Pennsylvania,* 517 Pa. 65, 534 A.2d 760, 765 (1987) (*"Allegheny County II "*). The *PSACC* Court also ordered the appointment of a master to prepare recommendations for implementation of the Court's ruling, and retained jurisdiction. In 1997, the master duly submitted an interim report, to which objections were filed. Thereafter, in 1999, the General Assembly enacted legislation which essentially effectuated the first phase of the master's recommendations. On December 8, 2008, petitioners, the Pennsylvania State Association of County Commissioners,[1] and the Counties of Allegheny, Bucks, Cumberland, Dauphin, Erie, Forest, Fulton, Monroe and Tioga, filed what is styled as a "Motion to Enforce Grant of Petition for Mandamus and Order," requesting that we "take appropriate action to enforce [the] Order of July 26, 1996 to compel the General Assembly to provide funding for the unified judicial system and to take those steps necessary to implement the Report of the Master and to take such other action as this Court deems appropriate under the circumstances." After careful consideration and thorough review, we now deny the motion to enforce, and we relinquish jurisdiction over the mandamus matter.

## I. *Background*

We begin with a history of the litigation in this complicated, seemingly intractable matter. In 1985, Allegheny County filed a declaratory judgment action, in the original jurisdiction of the Commonwealth Court, against the Commonwealth of Pennsylvania. *County of Allegheny v. Commonwealth of Pennsylvania,* 93 Pa.Cmwlth. 112, 500 A.2d 1267 (1985) (*"Allegheny County I "*). Allegheny County sought an order directing that the Commonwealth—and not the counties—must provide the operating funds for all of the Commonwealth's courts, including the Court of Common Pleas of Allegheny

---

1. The Pennsylvania State Association of County Commissioners is now known as the County Commissioners Association of Pennsylvania. Motion to Enforce Grant of Petition for Mandamus and Order, filed December 8, 2008, at 1 n.1.

County. Allegheny County argued that the Pennsylvania Constitution vests the Commonwealth's judicial power in a "unified judicial system," and Commonwealth funding of all courts is thereby commanded:

> The judicial power of the Commonwealth shall be vested in a unified judicial system consisting of the Supreme Court, the Superior Court, the Commonwealth Court, courts of common pleas, community courts, municipal and traffic courts in the City of Philadelphia, such other courts as may be provided by law and justices of the peace. All courts and justices of the peace and their jurisdiction shall be in this unified judicial system.

PA. CONST. art. V, § 1.

The declaratory judgment action was defended by the Attorney General on behalf of the Commonwealth. The Commonwealth Court rejected Allegheny County's argument, sustained the Commonwealth's demurrer and dismissed the action. 500 A.2d at 1271. The court held that the case was non justiciable, and also that the court had "no power to fashion a judicial remedy which would require the General Assembly to fund the county court system when that obligation has been imposed upon the counties by the General Assembly." *Id.* at 1270. The court reasoned that it could not "judicially infer that the creation of a unified court system necessarily embodies funding of the courts of common pleas by the General Assembly in the absence of something more concrete than a litigant's contention that this must be so." *Id.*

## A. *Allegheny County II*

On appeal, this Court vacated the Commonwealth Court's order in a four Justice to two Justice decision,[2] and entered judgment in favor of Allegheny County. *Allegheny County II,*

---

**2.** Mr. Justice Flaherty authored the majority opinion, and was joined by Messrs. Justice Larsen, Zappala and Papadakos; Mr. Chief Justice Nix filed a dissenting opinion, which was joined by Mr. Justice McDermott, and Mr. Justice Hutchinson did not participate in the decision of the case.

534 A.2d at 765. The Court majority first held that the declaratory judgment action was justiciable. The Court noted that a declaratory judgment inquiry encompassed "the ascertainment of the rights of the parties and whether protection for the asserted right can be judicially molded." *Id.* at 762. The Court then observed that because the General Assembly's control of fiscal matters might in some circumstances be limited by the Constitution, the "financing of state institutions has not been incontrovertibly and in all cases relegated to the direction and control of the General Assembly." *Id.* The Court stated that the action merely required a determination of whether the General Assembly had imposed obligations upon the County to fund Pennsylvania's court system, and if so, whether that obligation was constitutional. Since the rights of the parties "were able to be determined by construction of the relevant statutes and constitutional provisions," the Court held, the case was justiciable and the Commonwealth Court erred in entering judgment upon preliminary objections. *Id.* at 762.

Turning to the merits, the Court first recognized that, "it is apparent that the General Assembly intended to create a legislative scheme in which funding of the various judicial districts was primarily a responsibility of the counties, and that these responsibilities include the funding of salaries, services and accommodations for the judicial system." *Id.* at 763 (citing 42 Pa.C.S. §§ 2302, 3541, 3544, 3721 and 3722, and 16 P.S. § 1623). The Court then addressed the question of whether this obligation that the General Assembly placed upon the counties was constitutional. The Court held that it was not constitutional, because the "unified" judicial system envisioned in Article V, Section 1 of the Pennsylvania Constitution requires Commonwealth funding of all courts, including the county courts of common pleas. *Id.* at 765.

In explaining its holding, the Court first emphasized the last sentence of Article I, Section 5 of the Constitution, which provides that "All courts and justices of the peace and their jurisdiction shall be in this unified judicial system." PA. CONST. art. I, § 5. The Court then consulted the dictionary definition

of the term "unify," which means "to cause to be one: make into a coherent group or whole: give unity to: HARMON-IZE." *Id.* at 763 (quoting Webster's Third New International Dictionary). The Court then noted that Allegheny County's claim, in essence, was that the statutory system requiring the counties to fund their courts was not harmonious, but was instead "fraught with dissention [sic] and conflict which produces fragmentation." To illustrate this point, the County had focused on the fact that its authority to determine the number of employees necessary to the functioning of the local courts and their compensation, and the fact that the County is the employer for purposes of collective bargaining, "often embroil county authorities in disputes with the various judicial districts" over matters embracing, *inter alia,* collective bargaining rights, enforceability of labor arbitration awards, and whether the County's mandatory retirement system should cover court employees. *Id.* at 763–64 (characterizing County's argument). The Court then added that, in addition to disputes over collective bargaining and pensions, "there is a history of strife between the various judicial districts and the counties regarding funding [for court operations]." *Id.* at 764 (citing three examples of litigation that reached this Court).

The Court then opined that, "[i]t goes without saying that when relations between the judicial branch and the county governments deteriorate to the point where litigation is required to settle disagreements as to funding, the relationship is neither harmonious nor unified, but rather, fragmented." *Id.* The Court then noted that the Commonwealth argued that, irrespective of such disunity and fragmentation, the fact remained that the framers of the 1968 Constitution did not address the question of court funding, and therefore intended that the courts be funded as in the past, *i.e.,* by the counties. The Court rejected this argument, stressing that, while the Constitution does not specify the manner of funding, it "does require that the judicial system shall be unified," and in the Court's view: "It is inconceivable that unity, in any meaningful sense of that word, can be attributed to a court system characterized by management and fiscal disagreements which

periodically culminate in litigation in which the various counties and the courts within them are set off against each other as antagonists." *Id.* In making this point, the Court also addressed the argument forwarded in Chief Justice Nix's dissent (further described below) that county court systems were funded by an exercise of taxing power delegated to the counties, and thus, there was no disunity. The Court deemed this argument to be "illusory," because, while it may be true that the counties derive taxing power from the state, "these 'state' funds are being *administered by local authorities* in a manner that causes continual friction and dissension." *Id.* (emphasis in original).

After noting that its interpretation of the "concept" of unified judicial system depended not only upon its literal meaning, but also "upon an awareness of the legal and constitutional implications of those words," the Court added two additional points to support its conclusion that a unified system required centralized, Commonwealth funding of county courts. First, the Court addressed the issue of court staff, noting that the purpose of a unified judicial system is "to provide evenhanded, unbiased and competent administration of justice." *Id.* at 765. To the Court, this fact created an expectation that cases "will be processed as well in one county as another." *Id.* To meet that expectation, "judicial resources and staffing must be proportionately similar in all judicial districts," *i.e.,* "[t]here must be uniform hiring practices and standards, and judges must be free to hire competent staff, not merely those referred by local political figures." A system subject to such political considerations in hiring, the Court reasoned, "will be neither evenhanded nor competent." *Id.*

Second, the Court noted its concern with "the public's perception of the judicial system." *Id.* The Court stated that the citizens of the Commonwealth had a right "to be absolutely certain" that neutrality and fairness in adjudication will actually be applied in every case. The likely effect of permitting court funding to remain in the hands of local political authority, the Court opined, would be "suspicion or perception of bias and favoritism." *Id.* In the Court's view, a unified

judicial system cannot tolerate such uncertainties: "All courts must be free and independent from the occasion of political influence and no court should even be perceived to be biased in favor of local political authorities who pay the bills." *Id.*

For these reasons, the Court vacated the Commonwealth Court order and entered judgment in favor of the County. However, recognizing the disruption that its holding would create given the existing statutory scheme, the Court stayed its judgment "to afford the General Assembly an opportunity to enact appropriate funding legislation," thus leaving the existing funding scheme in place. *Id.*

Chief Justice Nix's dissent, joined by Justice McDermott, forcefully criticized the majority's reasoning, arguing that the question of court funding was clearly within the province of the General Assembly, and the majority's holding therefore violated the separation of powers doctrine. *Id.* at 765–68 (Nix, C.J., dissenting). The dissent further argued that: the majority neglected to note that the General Assembly already made a "significant direct contribution by reimbursement" to the County to defray court expenses, in addition to directly paying all judicial salaries; and the majority's conclusion that direct appropriation from the General Assembly was required for local courts ignored both "the distinction between the obligation to provide the funding and the discretion involved in determining an appropriate scheme of funding," and the fact that the County's taxing power is not separate and independent of the state's taxing power, but rather is a state power delegated to the County with conditions. *Id.* at 766. In the dissent's view, such a delegation of taxing power to counties where the common pleas courts were located "is in no way incompatible" with the constitutional requirement of a unified judicial system. *Id.* This was so because the constitutional mandate to fund the unified judicial system did not direct the method of funding; rather, that question was left to the Legislature. *Id.* at 765–66.

The dissent further criticized the majority by asserting that it had ignored that the complaint here was not brought by the unified judicial system or a constituent entity, but by a

political subdivision, the County, "complaining as to the burden placed upon it by its parent." *Id.* at 766. In the dissent's view, the County "has no right to complain" merely because a state delegation of taxing power carried with it "the concomitant responsibility" to use the funds generated for the purpose designated by the delegating authority. *Id.* at 766–67. The dissent also challenged the majority's conclusion that the court financing scheme "created an air of dissension that is incompatible with the concept of a *unified* system." The dissent viewed such disputes between local courts and county commissioners to be isolated and insufficient to prove an "irreconcilable state-wide breakdown of the local funding process," and further noted that centralized funding would not eliminate funding disputes but merely shift them, which did not promise "a more harmonious process." *Id.* at 767.

Finally, the dissent questioned the majority's "unstated judgment" that centralized direct funding would provide a "greater benefit" to the operation of a unified judicial system. *Id.* In the dissent's view, this was not a judgment to be made by the judicial branch, and the validity of the assumption was questionable. The dissent noted the diversity of the state, including a range in cost of living standards; standardizing salaries according to function, the dissent opined, could inflate the cost of court operations in a given county without assuring an enhancement in the quality of services. *Id.* at 767–68.

Within the time for reargument after the Court's decision, the Governor and the General Assembly—who had not participated as parties in the *Allegheny County II* litigation—filed applications to intervene. However, the applications were denied by operation of law because the Court deadlocked on whether to allow intervention. Justice Papadakos, who had joined the majority opinion, filed a dissenting opinion with respect to the post-decision applications of the Governor and the General Assembly; Chief Justice Nix and Justice McDermott joined this dissent. The dissenters noted that, "in the spirit of comity among equal branches of government," they would have granted the applications to intervene and would have permitted the Governor and the Legislature to argue their positions on the question whether they were constitution-

ally obliged to provide direct full funding for the entire unified judicial system. *Id.* at 768.[3]

The General Assembly did not enact comprehensive new court funding legislation in response to *Allegheny County II,* and over the years several requests to lift the stay and enforce the Court's judgment were lodged and denied. *See, e.g., Bradley v. Casey,* 545 Pa. 626, 682 A.2d 773 (1988) (*per curiam* order directing City of Philadelphia to fund Philadelphia courts); *City and County of Philadelphia v. Commonwealth,* 89 E.D. Misc.1989 (request for mandamus denied by *per curiam* order dated March 31, 1989). On February 12, 1991, Allegheny County filed a motion to lift the stay and enforce the 1987 judgment, which was denied by *per curiam* order on April 23, 1991. *See PSACC,* 681 A.2d at 703 n. 3.

### B. *Allegheny County III*

On October 7, 1992, Allegheny County and the State Association of County Commissioners filed another motion to enforce the 1987 judgment, seeking "an order to restore the level of funding existent in 1987 for Common Pleas Courts and district justice offices." In a very brief opinion authored by Justice Flaherty, the Court rebuffed the request, as follows: "Our 1987 order had nothing to do with *levels* of funding, but only with the method of funding. Because the instant petition is couched in terms of levels of funding, rather than the method of funding, the question of whether the legislature has violated our order is not squarely before us, for the system of funding is now the same as it was in 1987: the legislature now, as then, may choose or not choose to make contributions to fund county courts." *County of Allegheny v. Commonwealth of Pennsylvania,* 534 Pa. 8, 626 A.2d 492, 493 (1993) ("Allegheny County III") (emphasis in original).

3. There was some suggestion at oral argument in this case that the decision in Allegheny County II was a non-majority decision, the confusion arising from the fact that, in the reporter, Justice Papadakos's dissenting opinion followed immediately after Chief Justice Nix's merits dissent. However, it is clear that Justice Papadakos's dissent involved the post-decisional coordinate branch applications to intervene. The case was decided by a 4–2 majority; the 3–3 deadlock was limited to the applications to intervene.

Chief Justice Nix again filed a dissenting opinion, in which he reiterated his view that the 1987 order was improper and should be revoked: "The tragedy of the present situation is that the majority's order in [*Allegheny County II*] is unenforceable, and unenforceable orders like this breed contempt for the judgments of this Court." 626 A.2d at 493 (Nix, C.J., dissenting). Justices Larsen and Papadakos also filed dissenting opinions. Justice Larsen "would either grant the requested relief of state funding for the courts or revoke the original order." *Id.* (Larsen, J., dissenting, joined by Papadakos, J.). Justice Papadakos likewise expressed his "concern that this Court stands mute and ineffective in its interpretation of the Pennsylvania Constitution requiring the State to provide statewide funding for the uniform judicial district [sic]. Political considerations should be put aside and the Pennsylvania Constitution should be enforced." *Id.* (Papadakos, J., dissenting).

## C. *PSACC*

On December 7, 1992, petitioners filed a new mandamus action seeking an order compelling the General Assembly to abide by the Court's 1987 judgment. Respondents, the General Assembly—which had not appeared as a party in *Allegheny County II*—as well as the President of the Senate, the Speaker of the House, and "the Commonwealth of Pennsylvania," [4] argued that mandamus was not an available remedy and this Court had no jurisdiction over the matter; that the "speech and debate clause" of the Pennsylvania Constitution [5] shielded the legislative branch from the Court's authority; and that

4. It appears that the Attorney General represented the Commonwealth and "respondents" generally, 681 A.2d at 700, although the General Assembly was separately represented by counsel.

5. The so-called "speech and debate clause" provides: "The members of the General Assembly shall in all cases, except treason, felony, violation of their oath of office, and breach or surety of the peace, be privileged from arrest during their attendance at the sessions of their respective Houses and in going to and returning from the same; and for any speech or debate in either House they shall not be questioned in any other place." PA. CONST. art. II, § 15.

this Court's "denial of nearly identical prior petitions requires denial of this petition." *PSACC,* 681 A.2d at 701.[6]

On July 26, 1996, the Court issued its decision in a majority opinion authored by Mr. Justice Flaherty and joined by Messrs. Justice Zappala, Cappy and Nigro. *Id.* at 700–03. The Court assumed plenary jurisdiction over the action, which it viewed as a matter of immediate public importance, pursuant to 42 Pa.C.S. § 726, and the majority granted mandamus relief, ordering "that the General Assembly enact a funding scheme for the court system on or before January 1, 1998." *Id.* at 701.

In explaining its grant of mandamus, the majority first summarily noted that mandamus was the appropriate form for the enforcement action because "the General Assembly has a mandatory duty to fund the state courts and the petitioners have no other remedy at law." 681 A.2d at 702. The majority then rejected the claim that the Court's 1987 judgment violated the speech and debate clause. The Court explained that:

In this case, . . . where the legislature has been directed by this court to act in order to remedy a constitutional defect in the scheme which funds the court system, funding of which is necessary for the continued existence of the judicial branch of government, the legislature is not insulated from suit by the speech and debate clause. If it were, this court's duty to interpret and enforce the Pennsylvania Constitution would be abrogated, thus rendering ineffective the tripartite system of government which lies at the basis of our constitution.

*Id.*

The Court observed that the taxing and spending powers necessary to sustain the Judiciary are vested in the General

6. Respondents also argued "that a similar case is pending, barring this case from proceeding." *PSACC,* 681 A.2d at 701. The parties were apparently referring to an earlier motion to lift the stay filed by Allegheny County and denied on April 23, 1991, and the motion to enforce filed on October 7, 1992, which was denied in the 1993 *Allegheny County III* decision. As noted in the *PSACC* majority opinion, there was no other case pending at the time *PSACC* was decided. 681 A.2d at 703 n. 3.

Assembly. The Court noted, however, that should funds necessary for reasonable judicial functions not be provided by the General Assembly, the judicial branch possesses the inherent power to require that necessary funds be furnished and to direct payment out of the public treasury. Quoting from *Beckert v. Warren*, 497 Pa. 137, 439 A.2d 638 (1981), the Court stated:

> Absent such inherent power, the judiciary whose existence is mandated by Article [V] of the Pennsylvania Constitution, could be destroyed by the legislature:
>
> > Mr. Chief Justice Marshall said in *McCulloch v. Maryland*, 17 U.S. 316, 431 [4 Wheat. 316, 4 L.Ed. 579 (1819) ] "... the power to tax involves the power to destroy; ..." A Legislature has the power of life and death over all the Courts and over the entire Judicial system. Unless the Legislature can be compelled by the Courts to provide the money which is reasonably necessary for the proper functioning and administration of the Courts, our entire Judicial system could be extirpated, and the Legislature could make a mockery of our form of Government with its three co-equal branches—the Executive, the Legislative and the Judicial.
>
> It follows, therefore, that since the destruction of one branch of government by another would be antithetical to the constitutional scheme of separation of powers, any legislative action which impairs the independence of the judiciary in its exercise of the judicial power and the administration of justice would be similarly abhorrent.

681 A.2d at 703 (quoting *Beckert*, 439 A.2d at 642–43). Accordingly, the Court concluded, the speech and debate clause did not insulate the General Assembly from the Court's authority to require it to act in accordance with the Constitution.

The Court also rejected the Commonwealth's claim that "the present action is barred by principles of lis alibi pendens, res judicata and collateral estoppel in that prior similar actions have been filed and rejected by this court." *Id.* at 703. The Court reasoned that the prior actions did not share an identity of parties and relief sought, and that no other actions were

pending by the time the Court made its decision in *PSACC*. *Id.*

The *PSACC* Court then held that the "continued existence of an independent judiciary" was imperiled as a result of the General Assembly's failure to act on the court funding issue in the many years since *Allegheny County II*. Accordingly, the Court deemed mandamus relief to be appropriate, as follows:

> Because this court has attempted to act cooperatively with the General Assembly and has denied prior petitions for enforcement, allowing the General Assembly a period of nine years to enact a funding scheme which would provide the necessary financial support for state courts, and because the General Assembly has failed to act within this extended reasonable period of time, we now grant petitioner's request for a writ of mandamus. Pursuant to this writ, jurisdiction is retained and by further order a master will be appointed to recommend to this court a schema which will form the basis for the specific implementation to be ordered.

*Id.* at 703.

The "further order" referred to in the *PSACC* opinion described the parameters of the master's task, and was set forth at the outset of the opinion. The *per curiam* order stated:

> In furtherance of the decision entered in *Pennsylvania State Association of County Commissioners, et al. v. Commonwealth of Pennsylvania, et al. [PSACC]*, it is hereby ordered
>
> 1. Senior Judge (former Justice) Frank J. Montemuro, Jr. is appointed as the master to prepare recommendations to the Supreme Court as to the implementation of a unified judicial system.
>
> 2. In order to assist him in the performance of this responsibility, Senior Judge Montemuro is authorized to employ such staff as may be reasonable and necessary.
>
> 3. Senior Judge Montemuro is to undertake consideration of the following matters. The following description is intended as a guideline only and is not a limitation upon the

authority of Senior Judge Montemuro in fulfilling his responsibilities as master. Senior Judge Montemuro is directed to make recommendations regarding

A. identification of the parameters of the court-related offices and personnel included in the unified judicial system;

B. establishment of a single statewide judicial personnel system for all employees;

C. financial review of the unified judicial system, including but not limited to review if necessary of audits of existing resources, purchasing policies, existing contracts, and assessment of court-related facilities throughout the state;

D. standardization of a financial reporting system, accounting for expenditures, and uniform budget system;

E. standardization and unification of computer hardware, operating software, and programming;

F. allocation of judicial resources, including personnel, technological resources, and capital investments; and

G. such other matters deemed necessary for implementation of this Court's decision.

4. Senior Judge Montemuro is directed to prepare and submit an interim report regarding the progress of his undertaking no later than six months from the date of this order. Jurisdiction is retained.

681 A.2d at 700.[7]

Madame Justice Newman filed a concurring opinion, noting that she agreed with the majority's decision, but with "reservations." 681 A.2d at 706 (Newman, J., concurring). Justice Newman explained that she disagreed with the majority's reasoning, and felt that the matter should not have been decided without a factual record, but stated that *stare decisis* concerns compelled her to join the enforcement result. *Id.* Mr. Chief Justice Nix and this author filed dissenting opinions, and joined in each other's expression. Chief Justice Nix wrote briefly to "disassociate" himself from what he termed "this latest attempt by the majority to transgress the bound-

---

7. Justice Cappy did not participate in this *per curiam* order.

aries of a coequal branch of government." *Id.* at 707 (Nix, C.J., dissenting).

This author's dissent echoed Chief Justice Nix's view in *Allegheny County II* that "Article [V], Section 1 is utterly devoid of any language that requires the state to directly fund the *entire* unified judicial system," suggested that *Allegheny County II* was erroneously decided, and argued that mandamus was not an appropriate vehicle for relief. *Id.* at 708–10 (Castille, J., dissenting) (emphasis in original). The dissent expressed concern that the Court's order would transfer the Legislature's responsibility to raise and direct revenue "totally to the judicial branch, thus eliminating a vital check and balance between these two co-equal branches of the government." The dissent added that the friction and dissension between taxing authorities and local courts noted in *Allegheny County II* simply reflected "the delicate balancing of power within our system of government," did not warrant "wholesale elimination of the statutorily-enacted funding scheme whereby individual counties are responsible for the funding of their respective county court systems," and did not warrant the Court "assuming the power . . . to determine the funding level of the unified judicial system and then unilaterally imposing that determination on the legislative branch." 681 A.2d at 709 (Castille, J., dissenting).

On August 26, 1996, members of the General Assembly filed a "petition for review," naming the Administrative Office of the Pennsylvania Courts ("AOPC") and the Prothonotary of the Supreme Court of Pennsylvania as respondents, and asking that this Court vacate its July 26, 1996 *PSACC* decision and schedule a hearing during which they could present evidence. In this petition filed against administrative personnel of the Court—who were not parties to the *PSACC* litigation or decision—the legislators argued that the *PSACC* decision was procedurally defective because the General Assembly had not participated in the original *Allegheny County II* litigation, there was no factual record developed in the case, the Court's interpretation of "unified" was erroneous, and its holding interfered with the legislative branch's tax and spend

authority. *Jubelirer v. AOPC,* 130 W.D. Misc.1996. In response, the County Commissioners Association of Pennsylvania intervened and filed a motion to quash the legislators' petition for review. The petition by the members of the General Assembly was unusual in that it did not seek reargument, but rather, appeared to assume that the Court could entertain a collateral attack upon its just-rendered decision, via a petition for review. In an order dated October 15, 1996, the Court denied the request to vacate its July 26, 1996 order, deferred decision on the Commissioners' motion to quash, and directed further briefing on the petition for review. In a summary *per curiam* order dated June 17, 2002, we ultimately denied the petition.

### D. *Interim Report of the Master*

In the meantime, on July 30, 1997, Judge Montemuro issued an Interim Report on the Transition to State Funding of the Unified Judicial System ("Interim Report"). The Interim Report conceived and described four phases of transition to a fully state-funded judicial system: Phase I involved the institution of an administrative substructure, including the incorporation into the unified judicial system of court administrators, and the unification of court rules and procedures, as well as the standardization of information technology; Phase II involved incorporation into the unified judicial system of common pleas court and district court judges, their personal staffs, Pittsburgh Magistrates Court and Philadelphia Municipal and Traffic Court judges and their staffs, court reporters, data processing personnel, masters, hearing officers, arbitrators and parajudicial officials, and administrative support staff; Phase III involved incorporation into the unified judicial system of domestic relations services, adult and juvenile probation and parole services, investigative and diagnostic services, law libraries, and miscellaneous services; Phase IV included incorporation into the unified judicial system of clerks of court, prothonotaries, clerks of the orphans court, and registers of wills. Interim Report at 18–35.

Judge Montemuro's recommendations were aimed at remediating the problematic balkanization of the Commonwealth's court system. On this point, Judge Montemuro noted, in the Preface to his report, that "fragmentation is readily apparent in the Judiciary as it now stands: there are 67 counties comprising 60 judicial districts in Pennsylvania, suffering from numerous disparities in staffing, compensation, caseloads and programs." The Preface further noted that: "The President Judges of these districts are dependent upon the beneficence of 67 boards of commissioners for hiring, salary determinations, program support and physical and technological improvements. Each of these boards has a different vision of what constitutes the role of the Judiciary, and indeed what elements comprise the Judiciary; some of these visions are in diametric opposition to a judicial system which is a true and equal participant in a tripartite system of government." Interim Report at 8–9.

Although appointed as the Court's master, Judge Montemuro's findings and recommendations were not rendered in a vacuum, but instead were the culmination of remarkable, and surely unprecedented, inter-branch participation and cooperation. Indeed, Judge Montemuro oversaw a monumental year-long process that brought to the table then-Governor Thomas J. Ridge and his representatives, including General Counsel Paul Tufano, Esq.; Secretary of Administration Thomas Paese; Secretary for Budget Robert Bittenbender; Policy Director Charles Zogby; majority and minority representatives of both houses of the General Assembly, including President of the Senate Robert C. Jubelirer, Senate Majority Leader F. Joseph Loeper, Speaker of the House Matthew J. Ryan, Senate Democrat Leader Robert J. Mellow, House Democrat Leader William DeWeese, and members of the Majority and Minority Caucuses in the Senate and House of Representatives; the then-Chairman of Pennsylvanians for Modern Courts, the Honorable Edmund B. Spaeth, Jr.; representatives of the County Commissioners and the President Judges of the Courts of Common Pleas; representatives of the

Pennsylvania Conference of State Trial Judges; and staff of the AOPC. Interim Report at 4–6.

The *PSACC* parties filed cross-exceptions to the Interim Report. Although petitioners stated that they "welcomed" the Interim Report as a "significant first step," and asked that the Court accept it, petitioners also noted concerns about the master's recommendations regarding control of facilities, security, transfer of fixed assets, and funding of indigent defense in criminal cases. The presiding officers of the General Assembly, rather than finding fault with the report as measured against the task delegated to the master, essentially sought to relitigate the Court's mandamus order. Thus, the officers objected to the Interim Report on the ground that the Court's grant of mandamus relief and appointment of the master had not "accorded the Legislature the deference due to a co-equal branch of government." The Commonwealth, per the Attorney General, made a similar objection regarding due deference, and further stated that the "asserted constitutional principle for the recommendations contained in the report— the right of equal access to equal justice for all Pennsylvanians—has not been demonstrated to have been compromised to any degree." The exceptions to the Interim Report have remained pending, and this Court has not formally approved, or disapproved, of the Interim Report in whole or in part.

In the meantime, of course, each fiscal year and budgetary process since the report issued has included discussions, negotiations, and cooperative effort among the branches concerning the Judiciary's budget and the creation and integration of a more sensible unified judicial system. Thus, for example, the General Assembly passed Act 12 of June 22, 1999, 42 Pa.C.S. § 1905, significant legislation designed to integrate district court administrators, deputy court administrators, special court administrators, and associate and assistant court administrators, into the unified judicial system and its statewide budget, in line with the Interim Report's Phase I recommendations. This critical reform was no doubt instigated by Judge Montemuro's finding that "absent the establishment of an administrative infrastructure at the state level very early in

the transition, any attempt to enhance the system of delivering justice on a state-wide basis would be further impeded. Once in place, this central managerial core will be able to define its local executive organizations, capable of providing the necessary services, and trained in the accounting and auditing procedures, human resources and computer systems necessary for compliance with state standards." Interim Report at 11–12. Approximately 193 individuals were absorbed into the AOPC at that time, and the change was effectuated through inter-branch cooperation and legislative action, rather than by judicial mandate.

In addition, there were continued legislative efforts to finance, streamline and consolidate state-wide judicial computer operations, an ongoing project which had commenced before *Allegheny County II* was decided. Funding of state-wide judicial automation has been accomplished by multiple legislative enactments over the years, beginning with Act 64 of 1987, 42 Pa.C.S. §§ 3731–35, which included dedicated funding streams. However, petitioners' core position in the current enforcement litigation is that the General Assembly has taken no further specific action in response to the 1996 *PSACC* decision or Judge Montemuro's Interim Report which arose out of it. Petitioners now request that we order the General Assembly to go further, along the lines of that which was envisioned by Judge Montemuro.

## II. *The Current Lawsuit*

In December 2008, petitioners filed the instant action, seeking "to enforce [the Court's] Order of July 26, 1996 to compel the General Assembly to provide funding for the unified judicial system and take those steps necessary to implement the Report of the Master and to take such other action as this Court deems appropriate under the circumstances." Motion to Enforce Grant of Petition for Mandamus and Order at 4–5. On August 14, 2009, we directed the parties to brief the issues presented in the motion to enforce, and responses thereto, as well as the original issues raised in the exceptions and objec-

tions to Judge Montemuro's Interim Report.[8] The matter was then argued to the Court. As stated, this Court retained jurisdiction in its *PSACC* order, and the matter remains properly before the Court now. 681 A.2d at 700.

Petitioners argue that, in 1987, in *Allegheny County II*, this Court confirmed that the Pennsylvania Constitution requires that the "unified judicial system" be funded by the Commonwealth, not by sixty-seven individual counties. They assert that varying practices and availability of resources in each of these counties lead inevitably to unequal justice. Petitioners also note that there is precedent for this Court's enforcement of its mandamus orders. *See, e.g., Select & Common Councils of the City of Williamsport v. Commonwealth*, 90 Pa. 498 (1879) (county treasurer and councilmen properly held in contempt for failure to pay interest to bondholders in contravention of mandamus order); *Commonwealth v. Sheehan*, 81 1/2 Pa. 132 (1872) (Court fined and jailed Mifflin County commissioners for failure to obey mandamus order that they erect a bridge); *Commonwealth v. Taylor*, 36 Pa. 263 (1860) (Court fined and jailed Allegheny County commissioners for failure to obey prior mandamus order). Petitioners argue that without similar action in this case, the General Assembly will continue to flout this Court's order and the public will lose faith in all orders of our courts.

The Committee of Seventy[9] has filed an *amicus curiae* brief in support of petitioners, which focuses on the available relief that might be awarded in this case. According to the Committee of Seventy, this Court may order the Treasurer of the

8. Petitioners state they are now willing to withdraw their exceptions to the Interim Report in order to clarify the issues before us; petitioners assert that their exceptions were actually "suggestions" for Judge Montemuro to explore certain matters further, but they would not want additional study to delay implementation of the Commonwealth unification funding they seek. Petitioners' Brief at 8–9.

9. According to its Statement of Interest, *amicus* Committee of Seventy "is a Philadelphia-based non-profit, non-partisan 501(c)(3) organization founded in 1904 by civic and business leaders to reform what was then a corrupt political system. It works to achieve a clean, effective, and efficient government, fair elections, and a better informed citizenry in Philadelphia and in the surrounding region." Amicus Brief at 1.

Commonwealth to make the necessary payments even in the absence of a legislative appropriation, or the Court may enjoin the Commonwealth from paying other appropriated funds until the courts are funded to the minimum amount necessary for efficient operation. The Committee of Seventy argues that funds should be appropriated to the courts at a level equal to the average operating costs over the last three years. Committee of Seventy, Amicus Brief at 10–11.

Respondent, the Pennsylvania General Assembly, first takes the position that this Court should overrule both *Allegheny County II* and *PSACC* and hold that we lack jurisdiction because both the subject matter and the relief directed in the Court's prior judgments fall outside the Judiciary's constitutional authority. The General Assembly states that it has always required the counties to fund their common pleas courts, and *Allegheny County II*—which held that Commonwealth funding was required instead—was erroneously decided. The General Assembly argues that no factual record was developed in *Allegheny County II* and this Court did not order findings to develop its own record, and that neither the General Assembly, nor the Governor, were parties in *Allegheny County II*. In an attack upon the substantive decision in *Allegheny County II*, the General Assembly argues that the participants in the 1967 Constitutional Convention, when considering the issue of funding for the unified judicial system, rejected the idea of centralized Commonwealth funding for that system. The General Assembly also notes that this Court has rebuffed earlier attempts to enforce the 1987 directives of *Allegheny County II* and, in its view, properly so.

More pertinently to the present action to enforce, the General Assembly argues that this Court has never actually ordered it to do anything. The General Assembly notes that, although the Court's opinion in *PSACC* refers to a grant of mandamus, the Court's 1996 *order* in fact simply: 1) appointed a master; 2) authorized the master to appoint staff; 3) provided the master with a guideline of issues to address; and 4) directed the master to prepare and submit a report. *See PSACC*, 681 A.2d at 700. The General Assembly further

argues that Judge Montemuro's recommendations in his 1997 Interim Report were never adopted by this Court, were never made "final," and they are now stale.

Reprising its preferred core position that we reject our prior decisions in this litigation, the General Assembly argues that both *PSACC* and *Allegheny County II* "corrode[ ] the venerable Separation of Powers between branches and, if left uncorrected, degrade[ ] the foundation of our system of government." General Assembly's Brief at 12. Instead of enforcing these decisions, argues the General Assembly, this Court should dismiss the instant action, overrule *Allegheny II,* and then work together with the legislative branch to resolve the admittedly important issue of appropriate court funding. The General Assembly states that it "looks forward to working, in a manner consistent with its constitutional duties and with due respect for its co-equal branches of government, cooperatively with the Judiciary and the Executive to continue to take steps to unify further the administration of the Commonwealth's courts." General Assembly's Brief at 14.

In addition, the General Assembly attempts to relitigate its position on the political question doctrine, notwithstanding the rejection of its position in *PSACC*. Again noting that the powers to tax and spend are committed solely to the legislative branch, the General Assembly states that, to the extent this Court's decisions in *PSACC* and *Allegheny County II* "aspire to be more than precatory, they infringe upon the Legislature's core powers to tax and spend, thus breaching the political question doctrine." General Assembly's Brief at 22. In a similar vein, the General Assembly takes an absolutist position that, because a court cannot order legislation, this Court cannot enforce orders regarding court funding.

In a further effort to relitigate the decisions preceding our entry of mandamus, the General Assembly criticizes the decision in *Allegheny County II* on the basis that this Court relied on a dictionary definition of the term "unity," and allegedly "engaged in absolutely no analysis of the history" of Article V, Section 1, while conceding that the Constitution does not specify the manner in which the courts are to be funded.

General Assembly's Brief at 35 (citing *Allegheny County II*, 534 A.2d at 764). According to the General Assembly, consideration of the constitutional provision's history reveals that the constitutional requirement that the judicial system be "unified" refers only to consolidation of administration and control of the Judiciary, which had previously been inefficiently balkanized, and not to centralized state court funding of such a system.[10] The General Assembly argues that the Constitutional Convention of 1967–68 which devised the "unified judicial system" language limited its refinement to issues of judicial administration, organization, selection and tenure. *Id.* at 42. More importantly, the General Assembly asserts, the delegates rejected proposed language that specifically would have required state funding of the unified court system. *Id.* at 47. Under these circumstances, argues the General Assembly, the doctrine of *stare decisis* should not preclude us from revisiting what it believes were incorrect decisions in *Allegheny II* and *PSACC*. Finally, the General Assembly claims that there is no factual record to show that the current, chronic underfunding of the Judiciary is so inadequate that its very existence is imperiled. *Id.* at 66.

**10.** In its brief, the General Assembly discusses at length the historical basis for its position that a "unified judicial system" means a judicial system that is administratively unified, rather than one that is state-funded. General Assembly's Brief at 39–56. The General Assembly notes that the court system in place before the 1968 Constitution had been described, by former Justice Thomas W. Pomeroy, Jr., as "archaic, not to say chaotic." *Id.* at 40 (quoting from Thomas W. Pomeroy, Jr., *Foreword: The Pennsylvania Supreme Court in Its First Decade Under the New Judiciary Article*, 53 TEMP. L.REV. 613, 616 n.12 (1980)). In addition, the General Assembly quotes from the Reference Manuals created by the Preparatory Committee for the 1967–68 Constitutional Convention to support its position that Pennsylvania's pre-existing court system was "not really a system at all but [was] a collection of individual courts which have been made to fit together into a somewhat cumbersome whole." *Id.* at 39–40 (quoting from PENNSYLVANIA CONSTITUTIONAL CONVENTION 1967–68, REF. MANUAL No. 5, § 6.2.2(a) at 53). The General Assembly also relies on the Preparatory Committee's identification of the "distinguishing feature of a unified court system" as "uniform jurisdiction and centralized control and responsibility," with the rulemaking power for all courts residing in "a high court," rather than the levels or sources of funding. *Id.* at 46 (quoting from PENNSYLVANIA CONSTITUTIONAL CONVENTION 1967–68, REF. MANUAL No. 5, § 6.2.1(b), (e) at 51–53).

The Commonwealth of Pennsylvania, through the Office of the Attorney General, has filed a separate brief, also arguing that petitioners' motion to enforce should be denied. The Commonwealth echoes that the General Assembly is a co-equal branch of government, and the notion that the Judiciary may not assume its power to tax and spend. The Commonwealth argues that the "current funding method has been in effect for more than 200 years, and there has not been any showing that it has inhibited access of [sic] the courts, or that the court system lacks the funding necessary to carry out its responsibilities." Commonwealth's Brief at 2.

█ In reply, petitioners insist that this Court issued a valid mandamus order, and has the authority to enforce it. Petitioners reject the notion that this case presents a political question. They also reject the General Assembly's account of the 1967–68 Constitutional Convention, further suggesting that historical material related to those convention proceedings was improperly placed into the record here.[11] Petitioners' Reply Brief at 3–10.

III. *Analysis*

A.

We turn now to the specific question before us: whether petitioners are entitled to further mandamus relief based on this Court's pronouncements in *Allegheny County II* and *PSACC*. The Court's July 26, 1996 order in *PSACC* directed appointment of a master, and described the master's authority and tasks. Judge Montemuro was appointed master, and he submitted an Interim Report in July 1997, which reflected the realities of a fractured court system, the unsustainability of such a system, and the necessity for inter-branch cooperation in addressing the problems and creating effective solutions. Although Judge Montemuro was appointed as this Court's master, his efforts included the participation and cooperation of all three branches of government.

11. We reject petitioners' argument on this point, as legislative and constitutional history is a matter of public record, and, if deemed germane to our review, may properly be consulted.

Exceptions to the report were filed, but this Court has not decided them; in addition, we have neither adopted nor rejected the Interim Report, and we have not accepted or mandated implementation of specific recommendations via Court order. This is not to deny the salutary effect of the Interim Report, which was a direct product of *Allegheny County II* and *PSACC*. Judge Montemuro's primary Phase I recommendation was implemented by the General Assembly soon after the report, when court administrators were absorbed into the state court personnel system by legislation in 1999, and additional statutory enactments designed to further standardize and enhance state-wide judicial automation systems also were adopted. The General Assembly's implementation of these Phase I recommendations ostensibly established a foundation for potential future enhancements to state-wide funding of the unified judicial system. But, it is certainly accurate that subsequent phases of the transition contemplated and described in the Interim Report were not effectuated.

Essentially, we are now asked to direct the General Assembly to take additional action on recommendations that are nearly fifteen years old and that have yet to be adopted by this Court. The request to do so does not take into account the core, unifying advancements that have been made since the Interim Report was first issued, not to mention the interbranch cooperation involved in making those advancements, and the learning experience of the Court and the General Assembly in their cooperative effort to address difficult issues concerning what is essential to a state-wide unified system, and the manner in which that system should be funded. Laying aside the General Assembly's complaint that our prior decisions were unsupported by an adequate factual record, there obviously is some strength to the argument that what record exists now, primarily including the Interim Report, is outdated. Given what has transpired in the past, the interbranch advancements that have been made, and the current landscape—which is fundamentally different from the landscape confronting the Court in *Allegheny County II* and

*PSACC*—we are persuaded that the best course is to deny judicial relief to petitioners.

## B.

Preliminarily, we note that, although we decline to adopt and mandate implementation of further specific recommendations outlined in the master's Interim Report, neither do we accept the General Assembly's invitation to revisit and overrule *Allegheny County II* and *PSACC*, prior decisions in this very litigation. We recognize the less than optimal circumstances giving rise to those decisions, circumstances which have been detailed by the General Assembly here, and which were aired at some length in the prior dissenting opinions. The *Allegheny County II* Court obviously was impeded by the absence of an adequate record; hence, the necessity to appoint a master in *PSACC*. Moreover, the Court in *Allegheny County II*—which broadly directed the enactment of funding legislation by the General Assembly, but then stayed that mandate—did not have the benefit of the General Assembly as a respondent, because it arose in the context of a dispute between one county and the Commonwealth generally, over county funding for the local judiciary. When the General Assembly and the Governor filed applications to intervene within the time for reargument, those applications were denied. (It is also worth noting that there was no party in *Allegheny County II*, or in the subsequent litigation, specifically advocating the interest of the unified judicial system.) In addition, there were strong and colorable dissenting positions articulated on the substantive merits in both *Allegheny County II* and *PSACC*.

Although these decisions were rendered in imperfect conditions, produced strong dissents, and no doubt were controversial when rendered, there are multiple, salutary reasons why we should refrain from reconsidering their core holdings. First, and most elementally, we need not overrule the decisions in order to deny the relief that is requested by petitioners here. The prior decisions were broad and preliminary, establishing two essential propositions: (1) that the unified

judicial system must be funded by the Commonwealth; and (2) that a master would "prepare recommendations to the Supreme Court as to the implementation of a unified judicial system." The present action seeks "implementation" of the master's interim recommendations and a corresponding order of enforcement. As we will explain below, we do not believe that such an order is required to give force and effect to the unified judicial system as properly conceived.

■ Second, it would be a strange thing, indeed, to overrule a central prior holding in a later, enforcement iteration of the same case. The conclusion that the unified judicial system must be funded by the General Assembly was established in *Allegheny County II* and enforced in *PSACC*. The immediate practical consequence of those holdings was the appointment of the master, the commendable inter-branch cooperation that assisted him in marshaling information and completing his task, and the adoption of legislative measures, tracking some of the master's recommendations, which have created a more rational unified judicial system. As a general proposition, this Court should not revisit questions it has already decided. *See Commonwealth v. Starr*, 541 Pa. 564, 664 A.2d 1326, 1331 (1995) (discussing "law of the case" doctrine generally). The related rules in the "law of the case" doctrine operate: "(1) to protect the settled expectations of the parties; (2) to insure uniformity of decisions; (3) to maintain consistency during the course of a single case; (4) to effectuate the proper and streamlined administration of justice; and (5) to bring litigation to an end." *Id.* We recognize that there has not been a perfect identity of parties involved in all phases of this court-funding litigation, and there have been several different actions filed over the years, but the Commonwealth has been a party throughout, and the General Assembly has been directly involved since the *PSACC* case. The case is now in an enforcement phase deriving from the prior holdings; respect for the prior decisions is particularly strong in such a circumstance.

Even if the law of the case doctrine were deemed not to apply strictly, the related preclusion doctrine of *stare decisis* also counsels respect for the prior decisions in *Allegheny County II* and *PSACC*. The doctrine of *stare decisis* "promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process." *Buckwalter v. Bor. of Phoenixville*, 603 Pa. 534, 985 A.2d 728, 730–31 (2009) (quoting *Stilp v. Commonwealth*, 588 Pa. 539, 905 A.2d 918, 954 n. 31 (2006) (quoting *Randall v. Sorrell*, 548 U.S. 230, 126 S.Ct. 2479, 165 L.Ed.2d 482 (2006))). Of course, *stare decisis* "is not a vehicle for perpetuating error," but "a legal concept which responds to the demands of justice and, thus, permits the orderly growth processes of the law to flourish." *Id.* at 731 (quoting *Estate of Grossman*, 486 Pa. 460, 406 A.2d 726, 731 (1979) (quoting *Ayala v. Phila. Bd. of Pub. Educ.*, 453 Pa. 584, 305 A.2d 877, 888 (1973))). In this case, two majority decisions were rendered by the Court over multiple-Justice dissents making similar points to those now forwarded by the General Assembly in an effort at relitigation. Those decisions helped to bring the stakeholders to the table, substantial reliance interests have arisen in their wake, and specific measures toward implementing a unified judicial system have taken firm root. Given the passage of time since *Allegheny County II*, no Justice who participated in that decision is still a member of the Court, and this author is the only Justice to have participated in the *PSACC* decision nine years later. But, we have no doubt that the Courts as then constituted fully understood the gravity of the decisions rendered. We are not inclined, in the enforcement aspect of the same case, to reconsider the initial, fundamental judgment.

Third, the concerns that powered the decision in *Allegheny County II* were real. As the Court with ultimate responsibility for the unified judicial system, our Court was then, and remains now, well-positioned to appreciate the concerns; the master's report corroborated some of the concerns; and the measures that have been adopted in the aftermath of the

decisions and the master's report have addressed the most elemental obstacles to a truly unified judicial system. The *Allegheny County II* Court expressed legitimate concerns about the state of the unified judicial system at the time and the problems engendered by endemically fragmented, decentralized funding. 534 A.2d at 764. Among other points, the Court noted the dangers of disparate funding from county to county, and the need to process cases and administer justice "as well in one county as another." *Id.*

Similarly, the majority in *PSACC* made the indisputable point that the General Assembly—by withholding adequate funding—could threaten the Judiciary's very existence, and therefore, the courts obviously must have the power to compel adequate funding for a unified judicial system if necessary. 681 A.2d at 703. Equally significantly, for present purposes, the *PSACC* majority expressed the need for cooperation with the General Assembly, and lamented the failure of cooperative efforts to achieve a more satisfactory funding scheme in the nine years since the *Allegheny County II* decision had been issued. *Id.* There can be no doubt that the *PSACC* decision helped to bring about the inter-branch cooperation that was reflected when the master went about his task, when legislation was soon adopted along the lines of the master's primary proposals, and that same inter-branch negotiation has characterized subsequent budgetary cycles.

Furthermore, laying aside the scope of what functions related to county courts are essential to the functioning of a unified judicial system, the Court's experience in this process since *PSACC* has corroborated that certain centralized matters, as now constituted, indeed are essential to the functioning of a unified judicial system. The master, acting pursuant to our mandate, observed that, "absent the establishment of an administrative infrastructure at the state level very early in the transition, any attempt to enhance the system of delivering justice on a state-wide basis would be further impeded. Once in place, this central managerial core will be able to define its local executive organizations, capable of providing the necessary services, and trained in the accounting and auditing

procedures, human resources and computer systems necessary for compliance with state standards." Interim Report at 11–12. That central managerial, administrative and computer infrastructure has come into existence, the Court has had extensive experience with these structural changes, and we have no doubt as to its essentiality to the functioning of a truly unified judicial system. These experience-based circumstances bear some witness to the legitimacy of our initial decisions.

For all of these reasons, we will not revisit our prior decisions in this case.

## C.

■ We now turn to an explanation of why we will deny petitioners' request to enforce our prior decisions by ordering adoption of further "unifying" measures, along the lines of the additional measures proposed in the Interim Report. We recognize that our decisions in *Allegheny County II* and *PSACC* stated their (stayed) mandates in broad terms concerning the financing of local court functions. But, the Court has never implemented those terms with a similar broad specificity. Moreover, as we have noted, the landscape today is considerably different from the landscape facing the Court before the inter-branch cooperation which emanated from *PSACC* and the appointment of a master. This is true not only of what has already been incorporated into the unified judicial system but also in the resulting education and sophistication of all stakeholders in terms of what is required for an adequately functioning unified judicial system.

It is (relatively) easy enough to state that the Commonwealth must provide funding to ensure the unified judicial system that is constitutionally commanded. Experience has shown, however, that the more difficult question is what centrally-financed operations, relating to local courts, are necessary for the system truly to be unified. From this experience in incremental advancement of a unified system—experience which, by definition, was unavailable to the Courts that decided *Allegheny County II* and *PSACC*—has arisen a realization that it is neither necessary nor wise to require that **all**

matters affecting local courts become standardized and be subject to direct funding by the General Assembly. For example, Phases III and IV of the Interim Report recommended the incorporation into the unified judicial system of, *inter alia,* domestic relations, adult and juvenile probation and parole, investigative and diagnostic services, law libraries, and registers of wills. Interim Report at 32–36. These functions are, to say the least, tangential in the extreme to the functioning of a unified judicial system under the overarching authority of the Supreme Court.

Petitioners ask us to enforce our prior mandamus via adoption of an Interim Report which resulted in recommendations that this Court never formally adopted, that are out of date, that do not reflect the current reality of the unified system and this Court's experience with it, and that appear now to be unnecessary in the face of the unified judicial system as it now stands. We trust in the prospect of further cooperation of the coordinate branches to determine what local court functions are necessary, or wise, to be incorporated within a unified, centrally funded system. The situation is not now as it was in 1996, when the Court was faced with legislative inaction. Trusting in the continuation of this cooperative process, representing the best of government in action, we decline to require further specific legislative action.

Moreover, this Court does not exist in a vacuum. As we have recognized, the problems presented in *Allegheny County II, PSACC,* and the current litigation, arise out of the intrinsic difficulties of maintaining the delicate balance of a tripartite system of government, where the legislative branch controls the purse and the Judiciary, an independent branch, is dependent on the Legislature for funding. At this point in time, there are unique challenges that all branches of the Commonwealth's government face as a result of a continuing economic crisis and concomitantly diminished revenues.[12] In this context, we believe that the better course is for further enhancements of the unified judicial system to be a product of inter-

12. Prior to 2011, the Judiciary was underfunded by a cumulative $94 million; the level of funding for the unified judicial system had not kept pace with the basic needs of the system. For example, the General

branch cooperation. We say so with the recognition that the question of a unified judicial system is not only a matter of the "literal meaning of words" used to describe the entity, *Allegheny County II*, 534 A.2d at 764, and the Judiciary best knows what it takes to make the unified judicial system an effective, efficient, operational reality.

### IV. *Disposition*

For the foregoing reasons, we will not grant further mandamus relief; and neither are we inclined to go backward and overrule our prior decisions, rendered in light of the realities of that time. We are optimistic that recent progress on budgetary questions will continue; indeed, the General Assembly's arguments in this case confirm that it will; and we are encouraged that the changes implemented as a result of the 1997 Interim Report have served as a foundation for further evolution toward a better, administratively unified judicial system. Accordingly, we deny the motion to enforce.[13]

Jurisdiction relinquished.

Former Justice GREENSPAN did not participate in the decision of this case.

Justices SAYLOR, EAKIN, BAER, TODD, and McCAFFERY join the opinion.

Assembly enacted legislation creating additional judgeships, that was approved and signed by the Governor for the budget year 2009–2010, but then failed to provide sufficient funding to sustain those judgeships. The gap between the Judiciary's modest budget request and the Governor's budget proposal included insufficient funds to pay for the salaries and benefits of 68 trial judges and 90 magisterial district judges. The shortfall was remedied by short term assessments on judicial filings and a depletion of the Court's judicial automation fund, notwithstanding that that fund was designed as a separate and dedicated stream to ensure the integrity of state-wide judicial computer systems.

In the 2011–2012 budget cycle in Pennsylvania, collaboration between the three branches of the Commonwealth government resulted in a Judiciary budget that was moderately increased in a difficult budget year after years of flat or decreased budgets, albeit the funding was still insufficient to cover basic judicial needs, resorting again to depletion of the Court's judicial automation fund.

**13.** As a result of our holding, we dismiss the parties' exceptions to the master's Interim Report.